# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN WILLIAM FERRELL, JR.** | : | **CIVIL ACTION** |
| | : | |
| v. | : | NO. 25-5875 |
| | : | |
| **PROGRESSIVE DIRECT** | : | |
| **INSURANCE COMPANY** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                           **February 26, 2026**

Injured persons may hire a lawyer to resolve a claim with their insurer for benefits allegedly promised in an insurance contract. The injured person should expect his lawyer will provide records to the insurer to allow a fair evaluation of his claim recognizing an insurer generally will not pay an injured person's demand without records. We today address extraordinary delay from an injured person's lawyer providing information requested by the insurer. The lawyer demanded over a hundred thousand dollars without producing requested medical and other routinely produced records. The insurer offered recovery based on the only records produced to it.  The injured person hired a new lawyer who then sued demanding the insurer pay the full policy limits of $600,000 without producing records. We dismissed his first complaint for lack of jurisdiction. So he sued again claiming the insurer breached the insurance contract and also acted in bad faith by making a low offer. We studied the detailed record of the lawyers' interactions with the insurer. We find no conceivable basis to allow the insured person to proceed to trial on a bad faith claim against his insurer. The facts overwhelmingly confirm the first lawyer largely disregarded the insurer's repeated requests for information and the second lawyer resorted to demands not based on produced documents after he filed suit. We enter summary judgment dismissing the bad faith claim.

I. **Undisputed facts**

John William Ferrell, Jr. sustained injuries in a February 2022 car accident.[1] Progressive Direct Insurance Company insured the car he drove on the day of the accident, including underinsured motorist coverage.[2] Mr. Ferrell's injuries included back sprain and strain, traumatic brain injury and concussion–related symptoms such as concentration problems and emotional instability.[3]

Mr. Ferrell reported the accident to his insurer Progressive and his attorney made a claim for his medical benefits one week later.[4] Mr. Ferrell's lawyer also notified Progressive he would be making an underinsured motorist claim because the losses would exceed the amount of insurance purchased by the driver who injured him.[5]

### *Progressive opened an underinsured motorist claim on June 14, 2022.*

Progressive assigned the uninsured motorist claim to Dawn Eberle.[6] Ms. Eberle contacted Mr. Ferrell's attorney to discuss the claim and requested information.[7] Mr. Ferrell's attorney called Ms. Eberle on June 20, 2022 and the two discussed Mr. Ferrell's injuries with specific concern around the concussion and treatment and agreed Ms. Eberle would handle the underinsured motorist claim on a ninety-day review.[8]

Ms. Eberle reviewed the claim ninety days later, in September 2022, contacting Mr. Ferrell's attorney for a status update.[9] A paralegal at Mr. Ferrell's attorney's office reported Mr. Ferrell continued treating and had an appointment to see a specialist the next month but did not know the type of specialist.[10] Ms. Eberle continued to monitor the underinsured motorist claim on a ninety-day review.[11] Mr. Ferrell's counsel did not object to this timetable.

***Progressive continued to review the underinsured motorist claim
seeking supporting medical records with no response from Mr. Ferrell's lawyer through 2023.***

A paralegal from Mr. Ferrell's attorney's office reported to Progressive in early January 2023 Mr. Ferrell's injuries consisted of concussion, left rib injury, and soft tissue spinal injury, advised Mr. Ferrell's diagnostic imaging and physical therapy had been completed, and expected a neurological report to be completed soon.[12] Ms. Eberle noted in the claim file on February 17, 2023 Mr. Ferrell's counsel continued to wait for a neurological report to submit a demand to the third-party's insurance carrier.[13] Nothing happened for months.

Ms. Eberle checked with the third-party's insurer on April 18, 2023 for the status of the neurological report but no report had been received.[14] Ms. Eberle called Mr. Ferrell's attorney the same day to discuss the claim.[15] Mr. Ferrell's attorney did not respond to Ms. Eberle's call.[16]

Ms. Eberle did not hear from Mr. Ferrell's attorney for another three months and contacted him on July 20, 2023.[17] The attorney reported Mr. Ferrell had been referred to a neurologist who believed Mr. Ferrell had ongoing neurological residuals and told Ms. Eberle he is gathering medical records and will provide Progressive with a copy of the third-party demand.[18]

There is no evidence Ms. Eberle received a neurological report. By late October 2023, Mr. Ferrell's attorney told Ms. Eberle he did not have a response to the third-party demand and he would be filing a complaint against the other driver.[19]

The record shows for the entirety of 2023, Mr. Ferrell's counsel did not provide a neurological report to Progressive despite his claim of traumatic brain injury from the accident.

***Mr. Ferrell waited until May 2024 to make a demand but without
medical records to support his claim.***

Mr. Ferrell settled with the third-party's insurer for bodily injury liability limits in February 2024.[20] Ms. Eberle requested his lawyer provide her with a demand package for the underinsured

3

motorist claim in February 2024.[21] Mr. Ferrell's attorney did not provide a demand package for another three months until early May 2024.[22]

Ms. Eberle reviewed the demand package and, based on her review of the records she then had, noted Mr. Ferrell's injuries as (1) cervical/thoracic/lumbar sprain and strain with five months of conservative care; (2) traumatic brain injury and concussion with over one year of complaints and cognitive therapy for four months; and (3) possible left rib fracture with complaints for several months.[23]

Ms. Eberle evaluated the total underinsured motorist claim at $20,500 to $31,000 and, after applying the $25,000 bodily injury credit from the other driver's insurer, left a net evaluation of zero to $6,000.[24] Ms. Eberle noted medical records showed Mr. Ferrell had been out of work post-accident, but Mr. Ferrell did not offer information on his salary or the amount of work missed; Mr. Ferrell treated with a therapist for depression before and after the accident, but Mr. Ferrell did not produce those records; and Mr. Ferrell treated with neurologist Dr. Pearlstein but did not provide those records to Progressive.[25]

Mr. Ferrell's lawyer and Ms. Eberle discussed his claim on May 9, 2024.[26] Ms. Eberle offered $2,500 to settle the underinsured motorist claim as Mr. Ferrell did not provide her documents relating to wage loss, records from neurologist Dr. Pearlstein, or notes from the treating therapist for depression before and after the accident.[27] Mr. Ferrell's attorney rejected the offer without producing records, telling Ms. Eberle the case should settle in a range of $175,000 to $200,000.[28]

Mr. Ferrell's attorney asked Ms. Eberle to identify additional information she needed to evaluate the claim.[29] Mr. Ferrell's attorney offered to produce him for an independent medical examination with a neuropsychologist.[30] Ms. Eberle asked Mr. Ferrell's attorney for documents

4

supporting a lost wage claim, medical records from Mr. Ferrell's primary care physician, counseling records, diagnostic studies, and neurologist Dr. Pearlstein's report she needed to update her evaluation of the claim or consider an independent medical examination.[31]

### *Mr. Ferrell did not produce repeatedly requested records for months.*

Mr. Ferrell inexplicably did not produce the requested documents required for an independent medical examination. Ms. Eberle followed up with Mr. Ferrell's attorney on June 27, July 24, and August 7, 2024 with no response.[32]

Mr. Ferrell's attorney emailed Ms. Eberle on August 15, 2024 reporting he would respond to her requests the following week.[33] Counsel did not follow up with Ms. Eberle in August.[34] Ms. Eberle again contacted Mr. Ferrell's attorney on September 27, October 7, and November 15, 2024 regarding the requested documents with no response.[35]

There is no dispute as of mid-November 2024, Mr. Ferrell's counsel had not provided Ms. Eberle with the documents despite her requests for six months. Mr. Ferrell's counsel provided a records package to Ms. Eberle on May 7, 2024, but there is no dispute Ms. Eberle requested documents supporting a lost wage claim, medical records from Mr. Ferrell's primary care physician, counseling records, diagnostic studies, and neurologist Dr. Pearlstein's report needed to update her evaluation of the claim and schedule an independent medical examination in response to counsel's position he believed the case should settle in a range of $175,000 to $200,000.

In mid-November 2024, Mr. Ferrell's attorney told Ms. Eberle he would produce records from the primary care physician and diagnostic studies but would not produce counseling records.[36] Ms. Eberle explained the need for the counseling records, records related to the lost wages claim, and her need for an independent medical examination.[37]

Mr. Ferrell's attorney provided records relating only to the lost wages claim on December

5

31, 2024, and told her he is "working on the other documentation which you have requested."[38]

***Progressive revised its evaluation based on the limited records received in January 2025.***

Ms. Eberle communicated to Mr. Ferrell's attorney a revised, increased offer to settle the case based on the employment records in late January 2025.[39] Mr. Ferrell's attorney rejected the offer, and told Ms. Eberle he will provide the records from the primary care physician, he did not have additional diagnostic records, and offered signed medical authorizations to Progressive to obtain the records.[40] Counsel confirmed Ms. Eberle still required the counseling records.[41]

Mr. Ferrell finally produced medical authorizations on January 31, 2025.  Ms. Eberle then sought medical records from Holy Redeemer Hospital and Doylestown Hospital.[42] Ms. Eberle eventually received records from Doylestown Hospital in March 2025. A delay on the part of Holy Redeemer Hospital prevented Ms. Eberle from receiving diagnostic reports as of July 18, 2025.[43] Mr. Ferrell's attorney provided medical records from the primary care physician, but continued to refuse to provide counseling records until ordered to do so in litigation.[44]

Mr. Ferrell's counsel inexplicably still did not provide Ms. Eberle with counseling records from the treating provider for depression before and after the accident as of July 2025. And Ms. Eberle still did not have diagnostic films from Holy Redeemer Hospital required for the independent medical examination.

***Mr. Ferrell hired a new lawyer who sued for bad faith and demanded $600,000 without providing more information.***

Mr. Ferrell retained new counsel in July 2025 who filed a lawsuit against Progressive for breach of the insurance contract on July 24, 2025 invoking our diversity jurisdiction.[45] Because Mr. Ferrell's complaint did not properly plead the citizenship of the parties, we ordered Mr. Ferrell to dismiss his action without prejudice, amend his complaint to properly plead the parties' citizenship, or show cause why we should not dismiss the complaint without prejudice for lack of

6

subject matter jurisdiction.[46]

Mr. Ferrell's new counsel elected to amend the complaint but did not cure the pleading deficiencies to establish our subject matter jurisdiction. We dismissed the complaint without prejudice.[47]

Mr. Ferrell's new attorney sent Ms. Eberle a copy of the eventually dismissed complaint demanding Progressive pay the $600,000 in policy limits within ten days or he would amend his complaint to assert a bad faith claim.[48] Ms. Eberle told Mr. Ferrell's new attorney she still needed diagnostic reports from Holy Redeemer Hospital and an independent medical examination.[49] Mr. Ferrell's attorneys still refused to produce the counseling records to Ms. Eberle. Ms. Eberle also did not have medical records from Holy Redeemer Hospital necessary to complete an independent medical examination and to reevaluate the underinsured motorist claim.

Mr. Ferrell's attorneys did nothing for another two months, waiting until September 15, 2025 to file a new complaint against Progressive asserting a breach of the insurance contract and a statutory bad faith claim. Progressive removed this second case invoking our diversity jurisdiction.

The case proceeded through discovery and is set for trial next month.

**II.    Analysis**

Mr. Ferrell alleges Progressive acted in bad faith under Pennsylvania's bad faith statute for a variety of reasons, many of which overlap, primarily by refusing to pay the $600,000 in policy limits. We now address Progressive's motion for partial summary judgment on the bad faith claim. We enter judgment in favor of Progressive on the bad faith claim.

To prevail on a claim of bad faith under Pennsylvania's bad faith statute, Mr. Ferrell must prove by clear and convincing evidence two elements: (1) Progressive did not have a reasonable

7

basis for denying benefits under the policy *and* (2) Progressive knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.[50]

Pennsylvania's General Assembly did not define "bad faith." The Pennsylvania Supreme Court defines bad faith as "any frivolous or unfounded refusal to pay proceeds of a policy[.]"[51] The clear and convincing standard requires Mr. Ferrell to show "that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not [Progressive] acted in bad faith."[52] Because Mr. Ferrell carries a substantial evidentiary burden at trial on the clear and convincing standard, his burden in opposing summary judgment on the bad faith claim is "commensurately high."[53]

Progressive need only present "evidence of a reasonable basis for [its] actions or inaction."[54] As our Court of Appeals instructs, Progressive need only show "evidence of a reasonable basis for [its] actions or inaction" to defeat Mr. Ferrell's bad faith claim.[55] A review of the record shows Progressive's actions in handling Mr. Ferrell's underinsured motorist claim is reasonable.

Progressive argues there is no evidence it lacked a reasonable basis for its claims handling and it knew or recklessly disregarded the lack of a reasonable basis. Mr. Ferrell argues this is not a dispute over the value of his injuries or a delay attributable to the need for records. He contends this case involves deliberate delay, a lack of investigation, and unreasonable requests for more information. He argues Progressive "doesn't have a shred of medically-based evidence" to contradict the findings of his treating physicians he suffers from traumatic brain injury.

We scoured the produced record. Mr. Ferrell does not meet his burden in opposing summary judgment on his bad faith claim applying the clear and convincing standard. We enter judgment in favor of Progressive on the bad faith claim.

**A. Mr. Ferrell adduced no evidence Progressive acted unreasonably in its handling, including valuation of Mr. Ferrell's underinsured motorist claim.**

Mr. Ferrell alleges Progressive acted in bad faith by refusing to settle for policy limits, offering "varying false justifications for its delay and refusal to pay"; failing to consider the good faith interests of Mr. Ferrell in evaluating the claim; failing to timely investigate, negotiate, or settle the underinsured motorist claim; making an inadequate low-ball offer of settlement; failing to implement or follow proper policies and procedures for claim investigation and handling to deter legitimate claims; failing to schedule or timely schedule an independent medical examination before making a settlement offer; and refusing to effectuate a prompt good faith settlement and to do so in good faith, all with the knowledge, or reckless disregard, of "its utter lack of a reasonable basis" for its conduct.[56]

Mr. Ferrell claims bad faith because Progressive refused to pay him the $600,000 policy limits. He makes this claim with zero evidence his damages are anywhere near $600,000. Mr. Ferrell complains, with no evidence, his injuries exceed the low-ball settlement offers Progressive made to him. He also complains Progressive knew of Mr. Ferrell's underinsured motorist claim since at least February 2024 but did not settle the claim for policy limits, has all medical reports and other information required to evaluate the claim (which is entirely belied by the record), requested irrelevant records having nothing to do with the accident, and failed to schedule an independent medical examination.

An insurer's low-ball offer bearing "no reasonable relationship to an insured's actual losses can constitute bad faith within the meaning of" Pennsylvania's bad faith statute.[57] The insurer's failure to timely obtain a pre-litigation independent medical examination may also be probative of bad faith.[58] And "[d]elay is relevant in determining whether an insurer acted in bad faith, but 'a long period of delay between demand and settlement does not, on its own, necessarily constitute

9

bad faith.'"[59]

The record confirms Ms. Eberle initially evaluated Mr. Ferrell's claim as between $20,500 and $31,000 in May 2024. After applying the tortfeasor's $25,000 policy limit credit, Ms. Eberle offered Mr. Ferrell $2,500 to settle the underinsured motorist claim on May 9, 2024. Ms. Eberle's May 2024 offer considered Mr. Ferrell's treatment for cervical, thoracic, and lumbar sprain and strain for which he treated for five months, traumatic brain injury/concussion with over one year of complaints and cognitive therapy for four months, and a possible left rib fracture and complaints for several months.[60] Ms. Eberle also noted Mr. Ferrell did not follow up on all recommended treatment.[61] She recognized Mr. Ferrell's primary care physician indicated ongoing issues with memory and agreed to an independent medical examination with a neuropsychologist.[62] Ms. Eberle requested a copy of the counseling and other records in connection with a neuropsychology independent medical examination.[63]

Mr. Ferrell's attorney rejected the offer, believing the claim to be a "six figure case."[64] Ms. Eberle's claim notes show she and Mr. Ferrell's attorney disagreed on a six figure settlement on May 9, 2024 and then counsel offered Mr. Ferrell to undergo an independent medical examination or for her to "meet" Mr. Ferrell to support a valuation in the six figure range.[65]

Ms. Eberle's claim notes show she spoke to Mr. Ferrell's attorney on May 17, 2024 and the two agreed she would put her offer in writing and request additional documents needed to update her evaluation or consider an independent medical review or examination.[66] Ms. Eberle told counsel she needed confirmation from Mr. Ferrell's employer to evaluate the lost wage claim, medical records from Mr. Ferrell's family doctor for the last five years through the present, a copy of counseling records, a copy of diagnostic studies, and the report from treating neurologist Dr. Pearlstein.

The record shows Ms. Eberle requested records in mid-May, June, July, August, September, October, November, and December 2024 as she and counsel discussed in May 2024. By mid-November 2024, with no records provided, Mr. Ferrell's attorney promised he would produce records from the primary care physician and diagnostic studies but refused to produce counseling records. Mr. Ferrell's attorney ultimately produced the wage loss records on December 31, 2024.

Ms. Eberle promptly revised her total evaluation of the claim upward to account for Mr. Ferrell's wage loss; increasing the total evaluation to between $29,534 and $34,034. After applying the other driver's $25,000 policy limit credit, Ms. Eberle offered Mr. Ferrell $9,034 to settle the claim, the high end of the evaluation. Mr. Ferrell's counsel rejected the offer.

Ms. Eberle continued to seek further information from Mr. Ferrell's attorney to resolve the claim. Mr. Ferrell's counsel finally produced the records to Ms. Eberle ten months after she requested records from the treating primary care physician. Ms. Eberle reviewed the records from the primary care physician and noted Mr. Ferrell continued to treat for concussion complaints.[67] She noted she still awaited diagnostics from Holy Redeemer Hospital for the independent medical examination. Mr. Ferrell's counsel did not provide medical authorizations to obtain records from Holy Redeemer Hospital or Doylestown Hospital until January 31, 2025.

Mr. Ferrell's attorney never provided the counseling records. The record shows Mr. Ferrell's attorney knew Ms. Eberle needed the counseling records for an independent medical review or examination. The record shows Ms. Eberle told Mr. Ferrell's attorney she needed the counseling records for the independent medical examination. Mr. Ferrell's attorney agreed to speak with his client about the therapy records. Mr. Ferrell did not produce the therapy records.

The record shows a seven month delay by Mr. Ferrell's attorney to produce records he told

11

Ms. Eberle he would provide; from early May until the last day of December 2024. Mr. Ferrell disagrees, calling this a "flat-out misrepresentation" of the record and "a cheap shot at counsel" because the underinsured motorist claim did not become ripe until February 2024.[68] This bravado is incorrect. The record shows from the time Ms. Eberle and counsel discussed an independent medical examination in early May 2024—*after* the underinsured motorist claim became ripe—counsel did not provide the requested documents to support a "six figure" demand until December 31, 2024, and then only provided the wage loss documents. Mr. Ferrell's attorney continued to refuse to produce the counseling/therapy records even though Ms. Eberle explained she needed the records to confirm Mr. Ferrell's ongoing treatment related to the accident and for the independent medical review or examination.

Mr. Ferrell makes much of the request by Ms. Eberle for Holy Redeemer Hospital's diagnostic films. He argues Ms. Eberle had by May 7, 2024 a report—but not the films—of the CT scan of the head and X-rays of the cervical, thoracic, and lumbar spine and ribs from Holy Redeemer Hospital reporting normal results. Mr. Ferrell argues because Ms. Eberle had a "normal" report, it is unnecessary for her to request the actual film studies to provide to an independent medical examiner. He argues this shows an unreasonable delay but provides no authority supporting his argument an insurer's request for film studies when a CT scan or X-ray is reported "normal" somehow constitutes bad faith under Pennsylvania law.

Mr. Ferrell also argues Ms. Eberle received a records package from Mr. Ferrell's counsel on May 7, 2024 and this is all she needed to evaluate the claim because it contained "numerous" medical records from treating physicians, including records from a neurologist and a neuropsychologist. Mr. Ferrell suggests the receipt of records on May 7, 2024 obviated the need for additional medical records and Ms. Eberle's request for additional medical records is

12

unreasonable and shows a deliberate delay demonstrating bad faith.

We disagree Mr. Ferrell's argument creates a fact issue sufficient to overcome summary judgment. The record shows Mr. Ferrell's counsel sent Ms. Eberle on May 7, 2024: notes from a Jefferson Health emergency room visit after the accident; notes from his primary care physician; reports of CT scan and chest X-ray from Holy Redeemer Hospital and Doylestown Hospital; records from treating physical therapist; a neuropsychological evaluation; and a neurological examination.[69] No records for treatment of depression and anxiety were produced.

Based on the produced records, Ms. Eberle estimated the total claim at $20,500 to $31,000. Mr. Ferrell rejected this claim, demanding a six-figure valuation. Because Ms. Eberle and Mr. Ferrell's counsel disagreed on the valuation of the claim, counsel suggested an independent medical examination. The independent medical examination did not occur before Mr. Ferrell's new attorney filed the bad faith complaint despite Ms. Eberle asking for records to support the independent examination for a year, with only wage records produced.

Mr. Ferrell argues as of January 30, 2025, Ms. Eberle "was looking for only one item: the actual films [from the hospitals] in order to have a film/IMR completed."[70] This is incorrect. The claim notes on January 30, 2025 show Mr. Ferrell's counsel "ordered the [primary care physician] records from [physician] and is still waiting for these to come in. He will send these off to me as soon as he gets same;" he would "review the record again" for a neurologist's report; he would have Mr. Ferrell sign a medical authorization so Ms. Eberle can obtain the "actual films" of his diagnostic studies; and agreed to speak with Mr. Ferrell about producing therapy notes because Ms. Eberle wanted to "confirm [Mr. Ferrell's] ongoing treatment is related to the accident and not him dealing with his father[']s death or other issues. If treatment is a mixture of both then [Ms. Eberle] felt this would add value to [Mr. Ferrell's] case."[71]

No reasonable reading of the January 30, 2025 claim note entry supports Mr. Ferrell's argument Ms. Eberle "was looking for *only one* item"—the films from the hospitals. Ms. Eberle's notes show she needs not only the films, but additional records from the primary care physician and therapy notes. We disagree this argument creates a fact issue.

Mr. Ferrell's argument seems to be Ms. Eberle had all the records she needed as of the May 7, 2024 records package and her request for additional records to reevaluate the claim counsel believed to be "six figures" constitutes a genuine issue of material fact for a jury to decide. The record does not support this argument. Progressive never disputed Mr. Ferrell had a traumatic brain injury from concussion. Ms. Eberle's records show she noted a "TBI/Concussion over 1 yr of complaints, cognitive therapy for 4 months" and based her valuation of the claim on it, as well as back strain and possible rib fracture.[72] Ms. Eberle reasonably requested additional medical records to support the valuation of Mr. Ferrell's underinsured motorist claim. At the very least, Mr. Ferrell's counsel's undisputed delay and refusal to provide supporting documentation of a six-figure valuation dooms his bad faith claim.

Mr. Ferrell's argument Ms. Eberle had all the medical records needed to value the underinsured motorist claim at $600,000 as of March 2024 and, at the latest, only sought the diagnostic films as of January 2025 which she really did not need anyway is not supported by the record.

It is one thing for Mr. Ferrell to allege bad faith by Progressive, but it is another to meet the evidentiary burden required of him on summary judgment. As aptly stated by our Court of Appeals twenty years ago, summary judgment is "essentially 'put up or shut up' time" for the non-moving party.[73] There is nothing in the record to support Mr. Ferrell's bad faith claim based on a "low-ball" offer, valuation, or delay. Progressive's offers, made after consideration of the records

14

provided to it (much of which were belatedly provided or not provided at all) are reasonable.

Mr. Ferrell did not adduce clear and convincing evidence Progressive's valuation of his claim and its two offers were unreasonable. Mr. Ferrell believes anything less than the $600,000 full policy limit is a low-ball offer or delay demonstrating bad faith. But the record here does not demonstrate an unreasonable relationship between Mr. Ferrell's actual losses and Progressive's offer. Neither a low but reasonable estimate of the loss nor disagreement as to the amount of the settlement of a claim constitutes bad faith under Pennsylvania law.[74]

Progressive presented evidence of a reasonable basis for its actions; its burden as directed by our Court of Appeals.[75] Mr. Ferrell's strident hyperbole does not come close to meeting his burden at summary judgment on the first prong of the statutory bad faith claim. Mr. Ferrell essentially asks us to find a genuine issue of material fact based on Progressive's refusal to pay policy limits with no medical records to support his demand of policy limits constitutes bad faith. This theory is untenable both as a matter of fact and of law.

Mr. Ferrell did not meet his burden to prove the first prong of his statutory bad faith claim by clear and convincing evidence; we need not address the second prong of the claim. We enter judgment in favor of Progressive dismissing the bad faith claim.

### III. Conclusion

We enter summary judgment in favor of Progressive on the bad faith claim. Mr. Ferrell need only look to his lawyers' delay if he thinks Progressive should have acted sooner. And an insurer declining to immediately pay the policy limits when its insured will not produce records is not acting unreasonably.

---

[1] ECF 35, Progressive SUMF ¶¶ 1– 3. Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a memorandum, Statement of Undisputed Material Facts, and an appendix in support of summary judgment. Progressive Direct Insurance Company filed its motion for partial summary judgment,  memorandum, Statement of Undisputed Material Facts ("Progressive SUMF"), and appendix ("Appx.") at ECF 34, 35, 36.  Mr. Ferrell opposed the motion, responded to Progressive's SUMF, included a Counterstatement of Undisputed Material Facts ("Ferrell SUMF"), and added a supplemental appendix at ECF 43, 43–1 through 43–6. Progressive filed a reply brief at ECF 44.

[2] Progressive issued the policy to Corinna Ferrell with Mr. Ferrell listed as an insured driver/resident relative covered by the Policy on the date of the accident. ECF 35, Progressive SUMF ¶ 2.

[3] ECF 1-1, Complaint ¶ 16.

[4] ECF 35, Progressive SUMF ¶¶ 8, 9. The driver of the other vehicle had $25,000 bodily injury insurance coverage under a State Farm Mutual policy. *Id.* ¶ 6; ECF 36, Appx. 43a.

[5] ECF 35, Progressive SUMF ¶¶ 10–18.

[6] *Id.* ¶ 12.

[7] *Id.* ¶¶ 16, 17.

[8] *Id.* ¶ 18; ECF 36, Appx. 103a.

[9] ECF 35, Progressive SUMF ¶ 19.

[10] *Id.* ¶ 20.

[11] ECF 36, Appx. 67a–68a.

[12] ECF 35, Progressive SUMF ¶¶ 21–24.

[13] *Id.* ¶ 25.

[14] *Id.* ¶ 26.

[15] *Id.* ¶ 27.

[16] *Id.* ¶ 28. Mr. Ferrell concedes his attorney did not respond to Ms. Eberle's call, but noted the underinsured motorist claim was not yet ripe because the third-party claim did not resolve until February 13, 2024, when the third-party insurer (State Farm) tendered its full $25,000 bodily injury limit to Mr. Ferrell's counsel. ECF 43-1, Ferrell Response to SUMF ¶ 28; ECF 43, Ferrell SUMF ¶ 12. Mr. Ferrell's counsel appears to argue his admitted failure to respond to Ms. Eberle on April

18, 2023 is insignificant because the underinsured motorist claim was not yet ripe. We do not find this a disputed issue of material fact and, if anything, cuts against Mr. Ferrell's bad faith claim.

[17] ECF 35, Progressive SUMF ¶ 29.

[18] *Id.* ¶ 31.

[19] *Id.* ¶ 32.

[20] *Id.* ¶¶ 34–37; ECF 36, Appx. 104a–106a.

[21] ECF 35, Progressive SUMF ¶ 38.

[22] *Id.* ¶¶ 39–41.

[23] *Id.* ¶¶ 42–43.

[24] *Id.* ¶¶ 44–45. Mr. Ferrell does not deny Ms. Eberle's evaluation of the claim. *See* ECF 43-1, Ferrell Response to SUMF ¶¶ 44-45. He instead disagrees with the word "evaluated" as "an exaggeration to say the least" because "Ms. Eberle's 'evaluation' was nothing of the sort." *Id.* A disputed fact is "genuine" only if there is sufficient *evidentiary* basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" "if its resolution 'might affect the outcome of the suit under the governing law.'" *Mall Chevrolet, Inc. v. General Motors LLC*, 99 F.4th 622, 631 (3d Cir. 2024) (quoting *Anderson*, 477 U.S. at 248). Counsel's disagreement with the word "evaluation" does not create a genuine issue of material fact.

[25] *Id.* ¶¶ 47–49. Mr. Ferrell admits he treated with a therapist for depression and anxiety both before and after the accident and, as of early May 2024, records from the treating therapist had not been provided to Progressive. ECF 43-1, Ferrell Response to SUMF ¶ 48. Mr. Ferrell suggests the treating therapist's records were not material to Progressive because as of January 30, 2025—eight months later—Ms. Eberle's claim notes reflect "she was looking for only *one item*" the films from diagnostic studies at Holy Redeemer Hospital. *Id.* (emphasis in original). Even if we accepted Mr. Ferrell's interpretation of the claim notes—and we do not as further explained—the records Ms. Eberle sought in January 30, 2025 does not explain why his counsel did not produce the requested records in early May 2024.

[26] ECF 36, Appx. 78a.

[27] *Id.*, Appx. 77a (Ms. Eberle's claim notes of May 8, 2024 show Mr. Ferrell treated with neurologist Dr. Pearlstein "but this report was not provided"; therapy for treatment "with a therapist to discuss this [motor vehicle accident] as well as the prior issues (these records were not provided);" and "[d]octor disability confirms [out of work] as a glazier through [March 12, 2023] … [n]o confirmation from employer on salary, etc. Will need further documentation to consider same.").

17

---

[28] ECF 35, Progressive SUMF ¶¶ 51–53.

[29] *Id.* ¶ 54.

[30] *Id.* ¶¶ 53, 55, 57.

[31] *Id.* ¶ 56; ECF 36, Appx. 114a.

[32] ECF 35, Progressive SUMF ¶¶ 58–62; ECF 43-1, Ferrell Response to SUMF ¶¶ 58–62.

[33] ECF 35, Progressive SUMF ¶¶ 63–64.

[34] *Id.* ¶ 65.

[35] *Id.* ¶¶ 67–71.

[36] *Id.* ¶ 75.

[37] *Id.* ¶¶ 76–78.

[38] *Id.* ¶¶ 79–80; ECF 36, Appx. 119a.

[39] ECF 35, Progressive SUMF ¶¶ 81–84.

[40] *Id.* ¶¶ 86–87.

[41] *Id.* ¶ 89.

[42] *Id.* ¶¶ 90–97, 101, 106–114.

[43] *Id.* ¶ 115.

[44] *Id.* ¶¶ 102–103.

[45] *Ferrell v. Progressive Direct Ins. Co.*, No. 25-3823 ("*Ferrell I*").

[46] *Ferrell I*, ECF 6.

[47] *Ferrell I*, ECF 8.

[48] ECF 36, Appx. 133a.

[49] ECF 35, Progressive SUMF ¶ 119; ECF 36, Appx. 134a.

[50] *Berg v. Nationwide Mut. Ins. Co., Inc.*, 235 A.3d 1223, 1232 (Pa. 2020) (quoting *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017)). Pennsylvania's bad faith statute allows

for an award of interest, punitive damages, costs and attorney's fees against an insurer "[i]n actions arising under an insurance policy [] if the court finds that the insurer has acted in bad faith toward the insured." 42 PA. CONS. STAT. ANN. § 8371.

[51] *Rancosky*, 170 A.3d at 373 (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).

[52] *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (citation omitted).

[53] *Id.*

[54] *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 191 (3d Cir. 2021) (quoting *Pilosi*, 393 F.3d at 367).

[55] *Gibson*, 994 F.3d at 191.

[56] ECF 1-1 ¶¶ 36–50.

[57] *Seto v. State Farm Ins. Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012) (citing *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004)); *see also Ockford v. Encompass Ins. Co.*, No. 24-1581, 2025 WL 1019782, at *4–5 (E.D. Pa. Apr. 4, 2025), *appeal filed*, No. 25-1724 (3d Cir. Apr. 16, 2025) (offer by insurer based on an assessment of medical records, without additional treatment records and wage loss figures provided by plaintiff's counsel, is reasonable and did not constitute bad faith) (collecting cases).

[58] *Baum v. Metro. Prop. and Cas. Ins. Co.*, No. 16-623, 2019 WL 4689024, at *5 (W.D. Pa. Sep. 26, 2019) (collecting cases).

[59] *Washington Street, LLC v. Nationwide Prop. & Cas. Ins. Co.*, No. 22-3396, 2023 WL 5950553, at *2 (3d Cir. Sep. 13, 2023) (quoting *Seto*, 855 F. Supp. 2d at 430).

[60] ECF 36, Appx. 76a.

[61] *Id.*, Appx. 78a.

[62] *Id.*, Appx. 77a-79a.

[63] *Id.*, Appx. 79a.

[64] ECF 35, Progressive SUMF ¶ 52; ECF 36, Appx. 78a.

[65] ECF 35, Progressive SUMF ¶ 53; ECF 36, Appx. 79a.

[66] ECF 36, Appx. 79a.

[67] ECF 36, Appx. 90a.

---

[68] ECF 43-2 at 9.

[69] ECF 36, Appx. 74a–76a.

[70] ECF 43, Ferrell SUMF ¶¶ 35; ECF 43–1, Ferrell Response to SUMF ¶¶ 48, 75.

[71] ECF 36, Appx. 86a. Mr. Ferrell alleged emotional instability as a result of the accident but counsel did not produce therapy records during the 2024 and early 2025 time period despite taking the position the case required a six figure valuation. Presumably, Mr. Ferrell's emotional injury resulting from the accident figured into counsel's valuation but he refused to provide therapy records. ECF 1–1 ¶ 16.

[72] *Id.*, Appx. 76a.

[73] *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

[74] *Smith v. State Farm Mut. Auto. Ins. Co.*, 506 F. App'x 133, 137 (3d Cir. 2012) ("the failure to immediately accede to a demand for the policy limit cannot, without more, amount to bad faith"); *Tomaszewski v. Allstate Ins. Co.*, Nos. 19-80, 19-133, 2022 WL 16553375, at *14, *21 (E.D. Pa. Oct. 28, 2022) (insurer did not act in bad faith when it made a reasonable opening offer based on the review of the claim and disagreement of the value did not show clear and convincing proof the insurer undervalued the claim with no reasonable basis).

[75] *Gibson*, 994 F.3d at 191.